UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

JOSEPH SANCHEZ,

                         Plaintiff,

          v.

COMMISSIONER OF SOCIAL SECURITY,

                       Defendant.

_____

<u>DECISION & ORDER</u>

19-CV-0408MWP

## <u>PRELIMINARY STATEMENT</u>

Plaintiff Joseph Sanchez ("Sanchez") brings this action pursuant to Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), seeking judicial review of a final decision of the Commissioner of Social Security (the "Commissioner") denying his application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). Pursuant to the Standing Order of the United States District Court for the Western District of New York regarding Social Security cases dated June 1, 2018, this case has been reassigned to, and the parties have consented to the disposition of this case by, the undersigned. (Docket # 17).

Currently before the Court are the parties' motions for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. (Docket ## 8, 13). For the reasons set forth below, this Court finds that the decision of the Commissioner is supported by substantial evidence in the record and is in accordance with applicable legal standards. Accordingly, the Commissioner's motion for judgment on the pleadings is granted, and Sanchez's motion for judgment on the pleadings is denied.

**DISCUSSION**

I.    **Standard of Review**

      This Court's scope of review is limited to whether the Commissioner's determination is supported by substantial evidence in the record and whether the Commissioner applied the correct legal standards.  *See Butts v. Barnhart*, 388 F.3d 377, 384 (2d Cir. 2004) ("[i]n reviewing a final decision of the Commissioner, a district court must determine whether the correct legal standards were applied and whether substantial evidence supports the decision"), *reh'g granted in part and denied in part*, 416 F.3d 101 (2d Cir. 2005); *see also Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998) ("it is not our function to determine *de novo* whether plaintiff is disabled[;] . . . [r]ather, we must determine whether the Commissioner's conclusions are supported by substantial evidence in the record as a whole or are based on an erroneous legal standard") (internal citation and quotation omitted).  Pursuant to 42 U.S.C. § 405(g), a district court reviewing the Commissioner's determination to deny disability benefits is directed to accept the Commissioner's findings of fact unless they are not supported by "substantial evidence."  *See* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner . . . as to any fact, if supported by substantial evidence, shall be conclusive").  Substantial evidence is defined as "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (internal quotation omitted).

      To determine whether substantial evidence exists in the record, the court must consider the record as a whole, examining the evidence submitted by both sides, "because an analysis of the substantiality of the evidence must also include that which detracts from its weight."  *Williams ex rel. Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988).  To the extent

they are supported by substantial evidence, the Commissioner's findings of fact must be

sustained "even where substantial evidence may support the claimant's position and despite the

fact that the [c]ourt, had it heard the evidence *de novo*, might have found otherwise." *Matejka v.*

*Barnhart*, 386 F. Supp. 2d 198, 204 (W.D.N.Y. 2005) (citing *Rutherford v. Schweiker*, 685 F.2d

60, 62 (2d Cir. 1982), *cert. denied*, 459 U.S. 1212 (1983)).

        A person is disabled for the purposes of SSI and disability benefits if he or she is

unable "to engage in any substantial gainful activity by reason of any medically determinable

physical or mental impairment which can be expected to result in death or which has lasted or

can be expected to last for a continuous period of not less than 12 months." 42 U.S.C.

§§ 423(d)(1)(A) & 1382c(a)(3)(A). In assessing whether a claimant is disabled, the ALJ must

employ a five-step sequential analysis. *See Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982)

(*per curiam*). The five steps are:

> (1)    whether the claimant is currently engaged in substantial
> gainful activity;
>
> (2)    if not, whether the claimant has any "severe impairment"
> that "significantly limits [the claimant's] physical or mental
> ability to do basic work activities";
>
> (3)    if so, whether any of the claimant's severe impairments
> meets or equals one of the impairments listed in Appendix
> 1 of Subpart P of Part 404 of the relevant regulations (the
> "Listings");
>
> (4)    if not, whether despite the claimant's severe impairments,
> the claimant retains the residual functional capacity
> [("RFC")] to perform his past work; and
>
> (5)    if not, whether the claimant retains the [RFC] to perform
> any other work that exists in significant numbers in the
> national economy.

20 C.F.R. §§ 404.1520(a)(4)(i)-(v) & 416.920(a)(4)(i)-(v); *Berry v. Schweiker*, 675 F.2d at 467.

"The claimant bears the burden of proving his or her case at steps one through four[;] . . . [a]t

step five the burden shifts to the Commissioner to 'show there is other gainful work in the

national economy [which] the claimant could perform.'" *Butts v. Barnhart*, 388 F.3d at 383

(quoting *Balsamo v. Chater*, 142 F.3d 75, 80 (2d Cir. 1998)).


II.     **The ALJ's Decision**

        In her decision, the ALJ followed the required five-step analysis for evaluating

disability claims. Under step one of the process, the ALJ found that Sanchez had not engaged in

substantial gainful activity since March 1, 2015, the alleged onset date. (Tr. 17).[1]  At step two,

the ALJ concluded that Sanchez had the severe impairments of asthma, traumatic pneumothorax,

chronic obstructive pulmonary disease ("COPD"), learning disability, depressive disorder, and

anxiety disorder. (*Id.*). The ALJ also found that Sanchez had a history of heroin, marijuana, and

alcohol use, but that his substance use issues were nonsevere and "supposedly in remission."

(Tr. 18). At step three, the ALJ determined that Sanchez did not have an impairment (or

combination of impairments) that met or medically equaled one of the listed impairments in the

Listings. (*Id.*).

        The ALJ concluded that Sanchez retained the RFC to perform light work with

certain limitations. (Tr. 19-20). Specifically, the ALJ determined that Sanchez could

occasionally climb ramps and stairs; should avoid exposure to extreme cold, wetness, humidity,

and irritants such as odors, fumes, dusts, gases and poor ventilation; could understand, carry out,

and remember simple, routine and repetitive tasks (defined as work that requires doing the same

---

[1]  The administrative transcript (Docket # 4) shall be referred to as "Tr. ___," and references thereto utilize the internal Bates-stamped pagination assigned by the parties.

tasks everyday with little variation in location, hours or tasks); could work in a low stress

environment (meaning one with no supervisory responsibilities, no work at production rate pace

and no fast-moving assembly line-type work, no independent decision-making required except

with respect to simple routine, repetitive decisions, and with few, if any, work place changes in

work routines, processes or settings); could perform work that would not require a high level of

attention to detail, work that is subject to no more than occasional supervision, and work that

does not require travel to unfamiliar places; could perform work that involves occasional contact

and interaction with supervisors and coworkers and incidental contact with the public; and could

do work performed independently or work that could be performed generally isolated from other

employees with coworkers within the general work area.  (Tr. 19-20).

At steps four and five, the ALJ found that Sanchez had no past relevant work but,

based on Sanchez's age, education, work experience, and RFC, that other jobs existed in

significant numbers in the national economy that he could perform, such as marker, mail clerk,

and office helper, all of which were classified as unskilled work with a specific vocational

preparation ("SVP") level of two.  (Tr. 31-32).  Accordingly, the ALJ found that Sanchez was

not disabled.  (Tr. 32-33).


### III.   Sanchez's Contentions

Sanchez contends that the ALJ's determination that he is not disabled is not

supported by substantial evidence and is the product of legal error.  (Docket ## 8, 15).  First,

Sanchez maintains that the ALJ erred at step two by not evaluating injuries he sustained from a

February 2017 dirt bike accident, which he claims included a brain hemorrhage (subdural

hematoma) and degenerative changes in his lumbar spine.  (Docket # 8 at 11-13).  Second,

Sanchez argues that the ALJ relied upon stale medical opinion evidence in reaching her RFC determination because two of the medical opinions on which the ALJ relied predated Sanchez's February 2017 bike accident, which, in Sanchez's view, resulted in the ALJ improperly reaching an RFC determination based on her lay interpretation of the medical evidence. (*Id.* at 13-15; *see also* Docket # 15 at 1-2). On the current record, neither of these arguments is persuasive.

## IV.   Analysis

### A.   The ALJ's Step Two Determination

I turn first to Sanchez's step two argument. Specifically, Sanchez maintains that the ALJ erred by failing to mention and engage in a severity analysis regarding his brain hemorrhage and degenerative changes in his lower lumbar spine, supposedly sustained as a result of his February 19, 2017 bike accident. (Docket # 8-1 at 12-13). This argument fails, the Commissioner counters, because Sanchez "points to no medical evidence showing that those injuries more than minimally impacted his ability to perform basic work activities." (Docket # 13-1 at 22). I agree with the Commissioner.

At step two of the sequential analysis, the ALJ must determine whether the claimant has a "severe impairment" that "significantly limits [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. §§ 404.1520(a)(4)(ii), (c), 416.920(a)(4)(ii), (c). It is the claimant's burden to present evidence demonstrating severity at step two. *See Briggs v. Astrue*, 2011 WL 2669476, *3 (N.D.N.Y.), *report and recommendation adopted by*, 2011 WL 2669463 (N.D.N.Y. 2011). "An impairment or combination of impairments is 'not severe' when medical and other evidence establishes only a slight abnormality or a combination of slight abnormalities that would have at most a minimal effect on an individual's ability to perform

basic work activities." *Jeffords v. Astrue*, 2012 WL 3860800, *3 (W.D.N.Y. 2012) (internal quotation omitted); *see also Schifano v. Astrue*, 2013 WL 2898058, *3 (W.D.N.Y. 2013) ("[a]n impairment is severe if it causes more than a *de minimis* limitation to a claimant's physical or mental ability to do basic work activities").

Moreover, "[i]t is quite clear from the[] regulations that 'severity' is determined by the *limitations* imposed by an impairment, and not merely [by its] diagnosis." *Wahrmann v. Comm'r of Soc. Sec.*, 2014 WL 4626487, *5 (N.D.N.Y. 2014) (emphasis supplied). "The Second Circuit has held that an argument that an ALJ should have found an impairment severe is 'without merit' when the claimant 'did not furnish the ALJ with any medical evidence showing how these alleged impairments limited his ability to work.'" *Quiles v. Colvin*, 2015 WL 13729877, *11 (D. Conn. 2015) (citing *Britt v. Astrue*, 486 F. App'x 161, 163 (2d Cir. 2012) (summary order)), *report and recommendation adopted by*, 2016 WL 543102 (D. Conn. 2016); *accord Wahrmann v. Comm'r of Soc. Sec.*, 2014 WL 4626487 at *5 ("[t]he presence of an impairment is not in and of itself disabling within the meaning of the [Social Security] Act") (alterations and quotations omitted).

Here, although Sanchez is correct that the ALJ did not mention the February 2017 bike accident or any associated injuries at step two (*see* Tr. 17-18), his argument fails because of the absence of medical evidence demonstrating that those injuries caused any significant functional limitations. As the ALJ noted in the RFC portion of her decision, Sanchez was admitted to the emergency department at Buffalo General Hospital ("BGH") on the evening of February 19, 2017 following a dirt bike accident. (Tr. 26 (citing Tr. 757)). Sanchez testified that the accident occurred when he "popped a wheelie [on his bike] and smashed his head on the concrete." (Tr. 21 (referencing Tr. 77)). Sanchez was driving less than 30 miles per hour and

was not wearing a helmet when he was ejected from the bike.  (Tr. 757).  He presented to the emergency room at BGH following the accident "complaining of diffuse body pain as well as neck pain[,] headache[,] and pain in the right shoulder."  (*Id.*).  He reported having an "odd feeling" in both arms, but without weakness in his extremities.  (*Id.*).  The emergency department notes indicated a "[p]ositive loss of consciousness" from the accident.  (*Id.*).

On physical examination, Sanchez demonstrated cervical spine tenderness, for which he was given a cervical collar.  (Tr. 759).  Except for range of motion pain in his right shoulder, Sanchez otherwise demonstrated full active and painless range of motion in his left shoulder, as well as his elbows, wrists, hands, hips, knees, ankles and feet, and "report[ed] . . . an old right clavicle fracture."  (*Id.*).  Neurologically, Sanchez was alert and oriented to person, place, time, and situation, and could move all four extremities with full strength.  (*Id.*).  Sanchez also exhibited no tenderness in his thoracic or lumbar spine.  (*Id.*).

Sanchez underwent CT scans of his head, neck, back, and torso to evaluate the extent of his injuries.  (Tr. 675-85, 763-70).  Those scans revealed that Sanchez suffered a right middle lobe pulmonary contusion in his torso, a right-sided posterior fossa hemorrhage in his head, and no acute fractures in his neck, and he was ultimately diagnosed with an intracranial hemorrhage, laceration (for which he received four staples), and a pulmonary contusion. (Tr. 760-61).  The CT scan of Sanchez's lumbar spine showed no evidence of acute lumbar spine fracture or subluxation, but there were "mild degenerative changes of the lower lumbar spine at L5-S1."  (Tr. 678).  Sanchez was eventually transferred by ambulance to Erie County Medical Center ("ECMC").  (Tr. 761).

Upon admission to ECMC on February 20, 2017, Sanchez continued to complain of head pain and neck discomfort, but no other extremity injuries.  (Tr. 622-23).  On physical

examination, Sanchez demonstrated "generalized tenderness . . . throughout [his] [cervical] spine," no tenderness in his back, which was normal on inspection, normal range of motion, no deformity, and no edema throughout his extremities, and he was fully alert and oriented with no focal deficits.  (Tr. 623).  Overall, Sanchez's condition was "[f]air."  (Tr. 626).  Sanchez was reevaluated a short time later, at which time he was "hemodynamically stable," while complaining of "posterior headache, nausea, and photophobia" with "[n]o motor or sensory deficits."  (Tr. 618).  Sanchez continued to exhibit full range of motion throughout his extremities, had no focal motor or sensory deficits, and had normal mood, affect, and orientation. (Tr. 620).  On reexamination a few hours later, Sanchez was "clinically stable," "fully awake and alert, intact neurologically[,] . . . ha[d] no neck pain[,] . . . [and] [h]is range of motion [in his cervical spine] [was] painless," prompting the removal of his cervical collar.  (Tr. 616).

       As the ALJ pointed out, Sanchez also underwent further diagnostic testing on February 21, 2017 at ECMC.  (Tr. 26, 649-52).  A CT scan of his head performed at that time showed "no interval change in the epidural hematoma in the right posterior fossa" and "[n]o change in the nondisplaced occipital fracture underlying the hematoma."  (Tr. 649).  Moreover, a CT scan of Sanchez's brain revealed a "0.8 cm extra-axial hemorrhage within the right posterior fossa with a convex margin, [which was] suspicious for a small epidural hematoma," as well as the "[n]ondisplaced fracture of the right aspect of the occipital bone."  (Tr. 651).

       Sanchez was discharged from ECMC on February 25, 2017.  (Tr. 612).  At that time, Sanchez had facial abrasions and ecchymosis, but was neurologically intact.  (*Id.*).  The discharge summary indicated that Sanchez "gradual[ly] improve[d]" while at ECMC and needed "no surgery."  (Tr. 615).  Although he could not return to work or school at the time of discharge, he was cleared to resume day-to-day activities as tolerated, with no riding on dirt

bikes or motorcycles.  (*Id.*).  On April 4, 2017, Sanchez presented to the emergency department at BGH to have the staples removed from his head.  (Tr. 750).  By that point, Sanchez had already removed two of the four staples himself, there was no drainage from the wound, which appeared to be healed, and he exhibited "[n]o systemic symptoms."  (Tr. 750-51).  Sanchez also was not nauseous, had normal musculoskeletal range of motion and no deformity, and was fully alert and oriented neurologically.  (Tr. 751).  The remaining two staples were removed without difficulty.  (*Id.*).

Based on these records, Sanchez argues that the ALJ should have addressed his brain hemorrhage and the degenerative changes in his lumbar spine in her severity analysis at step two.  (Docket # 8-1 at 11-13).  As it relates to Sanchez's lumbar spine, aside from highlighting the results of the CT scan, Sanchez points to no evidence indicative of associated functional limitations that the ALJ failed to consider.  Initially, it is not clear that the degenerative changes in Sanchez's lower lumbar spine resulted from his dirt bike accident.  In the immediate aftermath of the accident, Sanchez did not demonstrate any pain or limitations associated with his lumbar spine; rather, his primary complaints related to neck pain, headaches, and right shoulder pain (Tr. 757), and he exhibited no tenderness in his lumbar spine (Tr. 759). The day after his accident, he continued to exhibit no tenderness in his back, and the cervical spine tenderness seemingly resolved before he was discharged from ECMC.  (Tr. 616, 623). Moreover, during his February 24, 2016 consultative internal medicine examination with Hongbiao Liu ("Liu"), MD, Sanchez reported chronic low back pain secondary to an accident that occurred on September 25, 2015, which Liu determined caused certain limitations. (Tr. 475-81).  This report calls into question Sanchez's suggestion that the degenerative changes in his lumbar spine resulted from his 2017 bike accident.

Significantly, even assuming that the degenerative changes in Sanchez's lumbar spine resulted from his 2017 bike accident, examinations post-dating that accident belie any argument that Sanchez's lumbar spine caused significant functional limitations.  (*See*, *e.g.*, Tr. 750-51 (emergency department note dated April 4, 2017: musculoskeletal examination showing normal range of motion and no deformity); Tr. 723-25 (emergency department note dated July 29, 2017: musculoskeletal symptoms revealing no back pain and no muscle pain, and normal range of motion in back); Tr. 735-47 (emergency department note dated October 13, 2017: no back pain, muscle pain or tenderness to palpation in back); Tr. 729-30 (emergency department note dated December 9, 2017: denying back or neck pain, and demonstrating normal musculoskeletal range of motion and strength); Tr. 711-20 (emergency department note dated January 5, 2018: noting no back pain)).  Accordingly, I find that the ALJ did not err by not evaluating this impairment at step two.  *See*, *e.g.*, *Jeffords v. Berryhill*, 2018 WL 6177269, *2 (W.D.N.Y. 2018) ("[a] mere diagnosis does not support a finding of disability, absent evidence of how severe claimant's symptoms are or how functionally limiting a claimant's condition is") (citing *Prince v. Astrue*, 514 F. App'x 18, 20 (2d Cir. 2013) (summary order)); *Quiles v. Colvin*, 2015 WL 13729877 at *11-12 (finding that the ALJ did not commit any error at step two; "[t]he record shows that [p]laintiff has a medical history of carpal tunnel syndrome; however, the record does not support [p]laintiff's position of severity[;] [p]laintiff has failed to point to evidence demonstrating that her carpal tunnel syndrome has limited her ability to do work[;] . . . [w]ith respect to major depressive disorder, again, there is evidence in the record that [p]laintiff has a history of depression and anxiety, but no evidence that it results in functional limitations").

In addition, to the extent that the ALJ did err in failing to evaluate this impairment at step two, the error was harmless.  As discussed in more detail below, the ALJ weighed and

credited Liu's consultative examination, which diagnosed Sanchez with "chronic back pain" and opined that Sanchez had mild limitations for prolonged walking, bending, and kneeling. (Tr. 477-78).  The ALJ accounted for these limitations in her RFC determination by limiting Sanchez to light work with only occasional climbing of ramps and stairs.  (Tr. 19).  Sanchez has failed to point to any evidence demonstrating that his back pain caused any additional limitations.  *See Coston v. Saul*, 2019 WL 4291314, *5 (W.D.N.Y. 2019) ("[t]he fact that plaintiff was diagnosed with other physical and mental impairments does not render the step two severity analysis and subsequent steps flawed where, as here, there is no evidence that these impairments resulted in additional limitations"); *Graves v. Astrue*, 2012 WL 4754740, *9 (W.D.N.Y. 2012) ("ALJ's severity assessment with regard to a given impairment is harmless . . . 'when it is clear that the ALJ considered the claimant's [impairments] and their effect on his or her ability to work during the balance of the sequential evaluation process'") (alteration in original) (quoting *Zenzel v. Astrue*, 993 F. Supp. 2d 146, 153 (N.D.N.Y. 2012)).

Moreover, Sanchez suggests that his brain hemorrhage injury caused "an inability to concentrate, . . . distractib[ility], [and] strained and illogical thought processes."  (Docket # 8-1 at 12).  As support, Sanchez cites one mental health treatment note from Neighborhood Health Center Mattina dated March 6, 2017.  (*Id.* (citing Tr. 567)).  No record evidence suggests, however, that the symptoms identified in that treatment note related to Sanchez's brain hemorrhage, as opposed to his other mental health impairments.  At that time, Sanchez presented to Carrie Ludwig ("Ludwig"), FNP, to follow up on his anxiety.  (Tr. 566).  Although Ludwig noted Sanchez's recent bike accident, she indicated that his symptoms upon presentation included anxiety, difficulty concentrating, excessive worry, insomnia, irritability, nervousness, panic attacks, shaky hands, sweaty palms, and sleep disruption, and that his anxiety resulted from

"withdraw[al] from methadone." (*Id.*). She did not indicate that the symptoms were caused by Sanchez's brain hemorrhage.

At most, the limitations that Sanchez posits are associated with his brain hemorrhage mirror the limitations caused by his anxiety. The ALJ explicitly accounted for Sanchez's anxiety at step two and included several related restrictions in her RFC determination to accommodate for that impairment. (Tr. 17, 19-20). Thus, even assuming that the ALJ erred by not explicitly discussing Sanchez's brain hemorrhage at step two, that error is also harmless. *See Coston v. Saul*, 2019 WL 4291314 at *5; *Graves v. Astrue*, 2012 WL 4754740 at *9.

For these reasons, Sanchez has not identified a step-two error warranting remand.

B.   **The ALJ's RFC Determination**

I turn next to Sanchez's argument that the ALJ relied on stale medical opinion evidence in making her RFC determination because the consultative opinions in the record predated Sanchez's February 2017 bike accident. (Docket # 8-1 at 13-15). Specifically, Sanchez maintains that the internal medicine examination completed by Liu is stale because he did not have the benefit of reviewing the CT scans of Sanchez's lumbar spine. (*Id.* at 14). In addition, Sanchez contends that the consultative psychiatric evaluation performed by Gina Zali ("Zali"), Psy.D, failed to consider the "effects" of his brain hemorrhage. (*Id.*). For the reasons explained below, these contentions lack merit.

An individual's RFC is his "maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis." *Melville v. Apfel,* 198 F.3d 45, 52 (2d Cir.1999) (quoting SSR 96–8p, 1996 WL 374184, *2 (July 2, 1996)). In making an RFC assessment, the ALJ should consider "a claimant's physical abilities, mental abilities, symptomology, including pain and other limitations which could interfere with work activities

13

on a regular and continuing basis." *Pardee v. Astrue*, 631 F. Supp. 2d 200, 221 (N.D.N.Y. 2009) (citing 20 C.F.R. § 404.1545(a)). "To determine RFC, the ALJ must consider all the relevant evidence, including medical opinions and facts, physical and mental abilities, non-severe impairments, and [p]laintiff's subjective evidence of symptoms." *Stanton v. Astrue*, 2009 WL 1940539, \*9 (N.D.N.Y. 2009) (citing 20 C.F.R. §§ 404.1545(b)-(e)), *aff'd*, 370 F. App'x 231 (2d Cir. 2010) (summary order).

On February 24, 2016, Zali conducted a consultative psychiatric evaluation of Sanchez. (Tr. 470-74). At that time, Sanchez was living with his girlfriend and newborn baby and was not currently employed. (Tr. 470). Zali noted that the highest level of education Sanchez completed was the eleventh grade. (*Id.*). Upon presentation to Zali, Sanchez reported difficulty sleeping and a loss of appetite. (*Id.*). Sanchez also reported that he experienced feelings of irritability, fatigue, feelings of worthlessness, and anxiety, all of which resulted from an assault he experienced a few months before the consultative evaluation. (Tr. 470-71). He reported symptoms of anger since childhood and outbursts approximately twice weekly which could involve destructive behavior. (Tr. 471). Sanchez did not report manic or cognitive symptomology or thought disorder. (*Id.*).

Zali's mental status examination revealed that Sanchez had a cooperative demeanor and responsiveness to questions and an adequate manner of relating. (*Id.*). His appearance, posture, motor behavior, and eye contact were appropriate, as was his speech. (*Id.*). Zali noted that Sanchez's thought process was coherent and goal-directed with no evidence of hallucinations, delusions, or paranoia. (Tr. 472). Sanchez demonstrated full affect, euthymic mood, clear sensorium, and was fully-oriented. (*Id.*). His attention and concentration, however, was mildly impaired, as he performed simple calculations and serial 3s with errors, and Zali

14

estimated his cognitive functioning to be below average. (*Id.*). Sanchez's recent and remote memory skills were intact, and Zali noted that his insight was limited but that he had fair judgment. (*Id.*). As far as activities of daily living, Sanchez reported that he could independently dress, bathe, and groom himself, could do simple cooking and general cleaning, laundry, and shopping, as long as he was not experiencing lung difficulties, could independently manage money and drive, and enjoyed watching television, listening to the radio, reading, and socializing with friends. (*Id.*).

Zali diagnosed Sanchez with intermittent explosive disorder and rule out adjustment disorder with anxiety. (Tr. 473). She opined that Sanchez had no limitations with his ability to follow and understand simple directions and instructions, perform simple tasks independently, maintain a regular schedule, learn new tasks, perform complex tasks, make appropriate decisions, or relate adequately with others, but had mild limitations maintaining attention and concentration, and had moderate limitations appropriately dealing with stress. (*Id.*). Zali further opined that Sanchez's prognosis was good and recommended that Sanchez seek psychological and psychiatric treatment and vocational training and rehabilitation when his symptoms were stable. (*Id.*).

The ALJ discussed this opinion in detail and afforded it "moderate weight." (Tr. 27, 31). She reasoned that the opinion was "consistent with the record as it relate[d] to the diagnoses of mental disorders and portions of the medical source statement that flow[ed] from the diagnoses." (Tr. 31). The ALJ acknowledged that Zali's consultative examination was a "one-time examination, and it d[id] not provide the entire longitudinal history of [Sanchez]." (*Id.*).

Also, on February 24, 2016, Sanchez underwent a consultative medicine examination conducted by Liu. (Tr. 475-81). Aside from his history of anxiety and depression, Sanchez reported a history of asthma since 2014, which was made worse by dust and smoke. (Tr. 475). Sanchez had asthma attacks about three times a year, one of which had prompted a visit to the emergency room in 2015, and he used an inhaler every day. (*Id.*). As noted above, Sanchez also reported chronic low back pain secondary to an accident that occurred on September 25, 2015. (*Id.*). During that accident, heavy metal apparently crushed the right side of his chest causing two rib fractures and a collapsed lung. (*Id.*). Sanchez stated that he had a pneumothorax five times since September 2015, and he saw a pulmonary specialist on December 16, 2015. (*Id.*). At the time he presented to Liu, Sanchez reported back pain at a level of 5/10, which he described as constant, pressure, and sharp. (*Id.*). Sanchez indicated that he could walk half a mile, he needed to change positions every two minutes while sitting or standing, and that cold weather made his back pain worse. (*Id.*). He denied numbness and tingling in his hands and toes, and, at the time of the examination, stated that he was receiving physical therapy three times a week for one month. (*Id.*).

On physical examination, Liu noted that Sanchez appeared to be in no acute distress, had normal gait and stance, used no assistive devices, needed no help changing for the examination or getting on and off the examination table, and was able to rise from a chair without difficulty, but walked on heels and toes with mild difficulty and squatted 60% of normal because of low back pain. (Tr. 476). Sanchez demonstrated full flexion, extension, lateral flexion bilaterally, and full rotary movement bilaterally in his cervical spine, and no scoliosis, kyphosis, or abnormality in his thoracic spine. (Tr. 477). His lumbar spine movement was limited – flexion/extension was 80 degrees; lateral flexion was 20 degrees bilaterally; and rotary

movement was 20 degrees bilaterally.  (*Id.*).  Straight leg raises were negative.  (*Id.*).  Sanchez

also had full range of motion in his shoulders, elbows, forearms, and wrists bilaterally, as well as

in his hips, knees, and ankles bilaterally, and his joints were stable and nontender.  (*Id.*).

Neurologically, Sanchez exhibited full strength in his upper and lower extremities with no

sensory deficit.  (*Id.*).  He had intact hand and finger dexterity and full hand strength bilaterally.

(*Id.*).

Liu diagnosed Sanchez with anxiety/depression, history of asthma, and chronic

back pain and opined that his prognosis was stable.  (*Id.*).  Liu further opined that Sanchez had

mild limitations for prolonged walking, bending, and kneeling, and should avoid dust and other

irritating factors to limit asthma attacks.  (Tr. 477-78).  The ALJ considered this opinion and

assigned it "[m]oderate weight."  (Tr. 25, 31).  As with Zali's opinion, the ALJ explained that

Liu's opinion was "consistent with the record[] as a whole as it relate[d] to the diagnoses of

physical impairments and portions of the medical source statement that flow[ed] from the

diagnoses[;] [h]owever, this was a one-time exam, and it d[id] not provide the entire longitudinal

record of [Sanchez]."  (Tr. 31).

Turning to Sanchez's argument, he is generally correct that "an ALJ should not

rely on 'stale' opinions – that is, opinions rendered before some significant development in the

claimant's medical history," *Robinson v. Berryhill*, 2018 WL 4442267, *4 (W.D.N.Y. 2018), and

that "[m]edical source opinions that are stale and based on an incomplete medical record may not

be substantial evidence to support an ALJ['s] finding," *Davis v. Berryhill*, 2018 WL 1250019, *3

(W.D.N.Y. 2018) (alterations, citations, and quotations omitted).  That said, "[t]he mere passage

of time does not render an opinion stale," *Whitehurst v. Berryhill*, 2018 WL 3868721, *4

(W.D.N.Y. 2018), and "a medical opinion is [not] stale merely because it pre-dates other

evidence in the record, where . . . the subsequent evidence does not undermine [the opinion evidence]," *Hernandez v. Colvin*, 2017 WL 2224197, *9 (W.D.N.Y. 2017) (citing *Camille v. Colvin*, 652 F. App'x 25, 28 n.4 (2d Cir. 2016) (summary order)); *accord Best v. Berryhill*, 2019 WL 1146341, *3 (W.D.N.Y. 2019) ("[t]he relevant issue is whether plaintiff's condition *deteriorated* during th[e] period [at issue]"); *Morgan v. Astrue*, 2010 WL 3723992, *13 (E.D. Tenn.) ("[i]n every claim for DIB or SSI before an ALJ, some time will elapse between the date that a medical opinion about the claimant's condition is rendered and the date that the ALJ considers that opinion[;] [f]requently, new evidence about the claimant's condition will come to light during the intervening period of time[;] [t]he SSA's disability determination process would cease to function if ALJs could not rely on a medical opinion simply because some new evidence entered the record after the opinion was provided"), *report and recommendation adopted by*, 2010 WL 3723985 (E.D. Tenn. 2010).  Here, I disagree that Zali's and Liu's consultative medical opinions were rendered stale by Sanchez's February 2017 accident, and I find that the RFC is otherwise supported by substantial evidence.

    First, Sanchez fails to explain how the CT scan of his lumbar spine on February 19, 2017 – revealing mild degenerative changes at L5-S1 – undermined Liu's February 2016 examination and opinion.  Liu expressly noted Sanchez's low back pain, which apparently stemmed from a September 2015 accident, and opined that certain functional limitations were appropriate based on that pain, albeit without the benefit of diagnostic imaging.  The results of the subsequent CT scan actually confirm and support Liu's diagnosis and opinion.  Moreover, there is no evidence that Sanchez's February 2017 bike accident caused his low back to deteriorate from the time of Liu's examination.  Rather, as explained above, treatment notes following the accident demonstrate that Sanchez did not specifically complain of low back pain,

and examinations of his back in the following months were consistently unremarkable.  The ALJ

was therefore entitled to rely on and credit Liu's opinion regarding Sanchez's back pain, which

she reasonably did by limiting Sanchez to light work with only occasional climbing of ramps and

stairs.  (Tr. 19).  In the absence of any evidence showing greater functional limitations related to

Sanchez's low back pain than those opined by Liu and reflected in the RFC, no basis exists on

this record to conclude that Liu's opinion was stale.

> Second, Sanchez also fails to explain how the "effects" of his brain hemorrhage

caused his condition to deteriorate from the time of the consultative examinations.  Tellingly,

Sanchez does not elaborate on what "effects" he experienced from this injury.  (*See generally*

Docket ## 8-1 at 14-15; 15 at 1-2).  As explained above, the one treatment note offered by

Sanchez to show issues relating to his concentration, distractibility, and thought processes, was

completed in the context of an evaluation of Sanchez's anxiety – not his brain hemorrhage.

(Tr. 567).  In any event, Zali noted Sanchez's issues with attention and concentration and opined

that Sanchez was mildly limited in his ability to maintain attention and concentration.  Moreover,

the ALJ explicitly accounted for these limitations in her RFC determination by limiting Sanchez

to, among other things, work with simple, routine and repetitive tasks, in a low stress

environment that would not require a high level of attention to detail, and that could be

performed independently or generally isolated from other employees with coworkers within the

general work area.  (Tr. 19-20).  Sanchez does not point to any evidence that undermines Zali's

opinion or the ALJ's decision to rely on that opinion.

> In short, I do not find that the opinions of Zali and Liu were rendered stale by

Sanchez's February 2017 dirt bike accident.  Sanchez neither points to any medical evidence

suggesting that after those opinions were rendered his condition deteriorated causing disabling

functional limitations, nor identifies any relevant evidence post-dating the medical opinions that

the ALJ failed to consider.  For these reasons, I find that substantial evidence supports the ALJ's

RFC assessment.  *See*, *e.g.*, *Ambrose-Lounsbury v. Saul*, 2019 WL 3859011, *3-4 (W.D.N.Y.

2019) ("[claimant] has not shown significant developments in her medical history following

[consultative examiner's] opinion that render it stale[;] . . . [claimant's] only new ailment after

[consultative examiner's] examination was the 'left ankle swelling'[;] . . . [b]ut the record does

not evidence any limitation from that swelling that the ALJ did not account for in the RFC[;] [s]o

the ankle swelling is hardly a 'significant development'"); *Sexton v. Berryhill*, 2018 WL

1835494, *7 (W.D. Okla.) (finding no error where ALJ relied on opinion evidence that was

completed "before all of the medical evidence was in and [[p]laintiff] became more severe[;] . . .

[h]ere, however, the opinions of the state agency physicians are relevant to the period to which

they apply, and [p]laintiff does not identify any evidence of a subsequent deterioration in

[p]laintiff's condition that was not reviewed and considered by the ALJ[;] [t]he ALJ expressly

stated that additional evidence . . . was received and admitted into the record subsequent to the

hearing and that he reviewed this evidence and considered it in his determination[;] . . . [b]ecause

the ALJ independently reviewed and considered the post-2014 evidence, and [p]laintiff points to

no credible evidence inconsistent with the RFC, the undersigned finds no reversible error in the

ALJ's reliance on the agency physicians' opinions"), *report and recommendation adopted by*,

2018 WL 1858255 (W.D. Okla. 2018); *Morgan v. Astrue*, 2010 WL 3723992 at *13 ("[i]n this

case, [p]laintiff has not shown that the additional objective evidence he cites was inconsistent

with the opinions of [consultative physicians][;] . . . [p]laintiff has not explained how a review of

the new evidence he cites would have changed the opinions provided by [consultative

physicians][;] [a]ccordingly, the [c]ourt cannot find error in the ALJ's decision to rely upon the doctors' opinions").

## **CONCLUSION**

After a careful review of the entire record, this Court finds that the Commissioner's denial of DIB and SSI was based on substantial evidence and was not erroneous as a matter of law.  Accordingly, the ALJ's decision is affirmed.  For the reasons stated above, the Commissioner's motion for judgment on the pleadings **(Docket # 13)** is **GRANTED**. Sanchez's motion for judgment on the pleadings **(Docket # 8)** is **DENIED**, and Sanchez's complaint (Docket # 1) is dismissed with prejudice.

**IT IS SO ORDERED.**

_____
*s/Marian W. Payson*
MARIAN W. PAYSON
United States Magistrate Judge

Dated: Rochester, New York
August 31, 2020